**2023 UT App 138**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF K.S.,
A PERSON OVER EIGHTEEN YEARS OF AGE.

STATE OF UTAH,
Appellee,
*v.*
K.S.,
Appellant.

Opinion
No. 20210291-CA
Filed November 16, 2023

Third District Juvenile Court, Salt Lake Department
The Honorable Mark W. May
No. 1108274

Monica Maio, Marina Pena, Sam Pappas, and Hilary
Forbush, Attorneys for Appellant

Sean D. Reyes and Jeffrey S. Gray,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN FORSTER and DAVID N. MORTENSEN
concurred.

TENNEY, Judge:

¶1 K.S., a minor, spent several weeks babysitting the infant child of some family members while they were at work. When the infant's parents returned home one day, the infant was in pronounced distress. The infant was taken to the hospital, but she died a few days later.

¶2 K.S. was charged in juvenile court with having committed child abuse homicide. At the close of trial, the juvenile court found

that K.S. had committed the crime and adjudicated K.S. delinquent as a result. K.S. now appeals that adjudication, arguing that there was insufficient evidence to support it. For the reasons set forth below, we affirm.

BACKGROUND

¶3     A.M., a four-month-old infant, died on May 10, 2019. Several medical experts later testified that the cause of death was a brain injury and that the fatal injury was likely inflicted in a non-accidental manner. The question at the heart of this case is who inflicted the fatal injury.

¶4     A.M.'s parents (Mother and Father) both worked and needed someone to watch their two children (A.M. and a two-year-old son) during the day. After an arrangement with a previous babysitter fell through, Mother and Father learned that K.S., the 16-year-old son of Mother's cousin, was available to babysit. Although K.S. had no prior child-care experience, he began watching the children in April 2019. Because of K.S.'s lack of experience, Father had to teach him the basics of childcare, including how to prepare a bottle, how to change a diaper, and how to calm A.M. down and "hold her correctly." K.S. frequently stayed overnight to save on gas, sleeping on a couch in the front room.

¶5     On May 2, Mother and Father took A.M. to the emergency room because A.M. had been sick for a few days. On examination, the ER doctor found "nothing worrisome," and tests indicated that her heart rate, oxygen saturation, and temperature were all "reassuring." The ER doctor concluded that A.M. "might have a bug" and sent her home. By May 6, A.M. seemed to be "feeling a little better."

¶6     K.S. slept over at the house on the night of May 6 to 7, and A.M. was "real fussy" that night. According to her parents'

subsequent accounts, though, A.M. was "crying normal[ly]" and even "cheery, smiling, [and] glowing" by the next morning. Mother left for work by 9:30 a.m.[1] Father later testified that he left for work between 8:30 and 8:45 a.m. (though, as will be discussed below, testimony from an officer suggested that Father didn't actually leave until 10:55 that morning).

¶7    At some point between 11:36 and 11:56 a.m., K.S. sent Mother a video that showed A.M. experiencing troubling symptoms—specifically, A.M. had a limp arm and labored breathing. K.S. texted, "Is this normal?" After viewing the video, Mother asked her sister (Aunt) to stop by on her lunch break to check on A.M.

¶8    Aunt arrived at about 1:20 that afternoon. A.M. seemed "lethargic" to her, and it seemed like "moving her was upsetting her more, almost like it was causing her pain." Aunt thought that A.M. might have an ear infection, so she gave her some ibuprofen. After returning to work, Aunt told Mother her concern about the ear infection and encouraged Mother to take A.M. to the hospital after Mother's shift ended. During her own lunch break an hour later, Mother returned home and checked on A.M., who was "fussy and whiney"; when Mother picked A.M. up, she also observed her legs "dangling down." Mother was concerned

---

1. At trial, a detective testified that Mother told him that she left "at about 9:30 in the morning." In her testimony, however, Mother said she didn't remember telling the detective that. Although she couldn't remember with precision when she did leave, Mother testified that she might have left between 8:00 and 8:30 that morning, if not a little earlier. Of note, no one has suggested that Mother left any later than 9:30. For reasons that will be explained below, this matters because, even if Mother left as late as 9:30, she was still out of the home several hours before the symptoms that were linked to the fatal injury appeared.

enough to schedule an appointment with a pediatrician, but she made lunch and returned to work without taking further action.

¶9     There was no additional contact between K.S. and the parents until around 7:45 that evening, when K.S. called Mother and reported that A.M still didn't seem to be feeling better. Mother said she was on her way. After picking Father up from his work, Mother arrived home to find A.M. "pale as a light." Father performed CPR while Mother called 911. Mother told the 911 dispatcher that A.M. had been "fine throughout the day and stuff."

¶10    A.M. was first taken to the Intermountain Healthcare hospital, then life-flighted to Primary Children's Medical Center (Primary Children's). Doctors at Primary Children's concluded that A.M. had suffered a severe brain injury.

¶11    Police detained Mother and Father for questioning before allowing them to see A.M. While awaiting the arrival of a detective, Father engaged police officers in light-hearted banter, telling them "a story about getting drunk and . . . dancing on the table," as well as a story about a woman beating up a man in their apartment complex. Mother and Father eventually met with a detective who questioned them about the events of the day. This detective later testified that, during these interviews, Father told him that he had left for work around 10:55 that morning.

¶12    The following day, K.S. sent Father two text messages. The first said: "im so sorry. . . . if it weren't for my laziness and wanting to relax [A.M.] wouldn't be like this and if i had never tossed her up in the air to try and cheer her up." The second said: "im truly sorry plz tell [Mother] im so so so sorry and i would never intentionally hurt your kids out of anger or frustration."

¶13    A.M. died two days later. Later that week, Dr. Christensen, the medical examiner, performed an autopsy and determined that

the "primary cause" of death was "blunt injuries" to A.M.'s head. Dr. Christensen classified the death as a homicide.

¶14    The State subsequently charged K.S. with child abuse homicide in juvenile court. Over the course of eight days of trial, the court heard testimony from, among others, both parents, several medical experts, and the responding officer.

¶15    Mother and Father testified about the events on May 7 and A.M.'s health in the relevant period. Mother testified that A.M. was "pretty fine" and "cheery, smiling, [and] glowing" before she left for work that morning. Father testified that, after a few days of being fussy, A.M. "was feeling a little better" and that there was "nothing out of the ordinary" that morning. Father testified that he remembered leaving home between 8:30 and 8:45 a.m. so that he could catch the bus.

¶16    The court also heard testimony from three medical experts—Dr. Thorn, Dr. Hatch, and Dr. Christensen—about the nature of A.M.'s injuries and the timing of those injuries.

¶17    **Dr. Thorn.** Dr. Thorn was an ER doctor who had "extensive training and expertise specialization in the management of head injury," and he was the doctor who treated A.M. on May 7 at the Intermountain Healthcare hospital. Dr. Thorn testified that A.M.'s symptoms likely resulted from "non-accidental trauma," which "is a nice way of saying a child . . . was physically abused." Dr. Thorn also testified that A.M.'s injuries would have required the application of "[e]xtremely violent" force, though he opined that it might have been "possible" that a person might not have "recognize[d] the severity" of the injury that he or she had inflicted.

¶18    On a CAT scan, Dr. Thorn observed two layers of blood in A.M.'s brain, which suggested to him that A.M. had sustained "at least two" discrete injuries. He estimated that the earlier of the two injuries occurred "within days" to "maybe a week" before

May 7. Dr. Thorn speculated that the symptoms that prompted A.M.'s visit to the hospital on May 2 had come from the first brain injury, but he acknowledged that "[w]e'll never know." With respect to the injuries that led to A.M.'s death, Dr. Thorn testified that the "most severe injury leading eventually to the death" happened anywhere from "sometime within hours" to "almost right before" the video that was taken on May 7. He further testified that there was "some event soon before arrival [at the ER] that had caused" A.M.'s "respiratory depression." Dr. Thorn felt unable to narrow the timeframe any further, and he expressed doubt that any doctor "would be able to comment as to a more definitive timeframe." Dr. Thorn also testified that A.M. "was very, very sick at the time that that video was taken."[2]

¶19 **Dr. Hatch.** Dr. Hatch was a recent medical school graduate who was completing a post-residency fellowship in child abuse pediatrics at the University of Utah, and he was part of the team that treated A.M. at Primary Children's. Dr. Hatch testified that it would have required a significant amount of force to cause A.M.'s symptoms, such as "shaking by itself" or shaking combined "with some form of impact, or impact by itself." He added that "we don't observe these kinds of injuries from falls" or even from "significant" car accidents. In Dr. Hatch's view, A.M.'s symptoms "suggest[ed]" that A.M. had "experienced significant force to her head." He also opined that anyone who was present when the injuries were inflicted "would know that the force was excessive and that an injury was likely" to follow.

¶20 Dr. Hatch thought there were two potentially plausible explanations for the two layers of blood in A.M.'s brain: he thought it was possible that the blood represented two different injuries that were separated by time, and he also thought it was

---

2. Of the three experts who testified at trial, it appears that Dr. Thorn was the only one who saw the video that K.S. sent to Mother on the morning of May 7.

possible that the blood represented a single injury where some of the blood had changed colors when it mingled with cerebral spinal fluid. Thus, in Dr. Hatch's opinion, A.M. was definitely injured on May 7, and it was possible that she had suffered an earlier brain injury as well.

¶21 As to the question of timing of the May 7 injury, Dr. Hatch testified that "the head injury immediately preceded the development of any symptoms that [A.M.] had. So in this situation where she became unconscious, the injury would immediately precede that." Continuing, Dr. Hatch testified that the "medical literature would support that in almost all cases with this severe of an injury," the resulting symptoms would appear "immediately afterward."

¶22 **Dr. Christensen.** Dr. Christensen is the chief medical examiner for the Utah Department of Health and, as noted, performed A.M.'s autopsy. Dr. Christensen testified that A.M. had suffered a "traumatic" "axonal injury" to her brain and that the injury was "not consistent with having occurred accidentally." In his view, the force involved would have been "noticeably violent."

¶23 Like Dr. Thorn, Dr. Christensen saw signs of both an earlier and a later injury. Dr. Christensen agreed that "some of [A.M.'s] prior symptoms"—including the nausea that led to her May 2 visit to the hospital—could have been "related to a prior head injury." On questioning from the State, however, Dr. Christensen seemed to agree that the later injury was "the ultimately fatal" one.

¶24 Dr. Christensen testified that in "some cases," fatal injuries can be inflicted as many as three to ten days before the child actually dies. But Dr. Christensen explained that doctors look to "other aspects of the case as well" when estimating the time at which the injuries were inflicted, such as "what was the child's behavior at various points along the way." He said that in this

case, he thought the fatal injury "occurred around the time" that A.M. arrived at the hospital. He also testified that with "traumatic axonal injury, you would expect [A.M.] to be symptomatic essentially immediately. I mean very, very quickly. It's not going to be the kind of thing where she is going to be normal for a few hours . . . . It's a global insult to the brain that is going to manifest as . . . abnormal behavior very soon after infliction."

¶25    After the conclusion of the trial, the court entered a single-sentence ruling determining that the State had met its burden of proving that K.S. committed child abuse homicide. K.S. timely appealed.

ISSUE AND STANDARD OF REVIEW

¶26    K.S. argues there was insufficient evidence to support his adjudication for child abuse homicide. In cases tried without a jury (which include juvenile court proceedings), factual determinations "must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the credibility of the witnesses." Utah R. Civ. P. 52(a)(4); *cf. In re Z.D.*, 2006 UT 54, ¶ 29, 147 P.3d 401 (holding that an "appellate court must launch any review of factual findings from rule 52(a) of the Utah Rules of Civil Procedure and its 'clearly erroneous' test"). "The content of Rule 52(a)'s clearly erroneous standard, imported from the federal rule, requires that if the findings (or the trial court's verdict in a criminal case) are against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made, the findings (or verdict) will be set aside." *State v. Walker*, 743 P.2d 191, 193 (Utah 1987) (quotation simplified).

¶27    The parties agree that we should apply the above-cited standard of review to this case. We pause here to note, however, that the parties have disputed whether we should apply an additional layer of deferential gloss in this case as well.

¶28   It's well-settled that when an appellate court reviews a jury's verdict, the court views the evidence and all reasonable inferences in the light most favorable to the verdict. *See, e.g., State v. Green*, 2023 UT 10, n.2, 532 P.3d 930; *State v. Bonds*, 2023 UT 1, n.3, 524 P.3d 581; *State v. Winfield*, 2006 UT 4, ¶ 2, 128 P.3d 1171. But there's a divergence in Utah's caselaw about whether an appellate court does the same when reviewing a verdict from a bench trial. On this, some Utah cases say no. *See, e.g., In re Z.D.*, 2006 UT 54, ¶ 35 ("An appellate court must indulge findings of fact made by a jury that support the verdict. No such indulgence is required of findings made by a judge."); *Alta Indus. Ltd. v. Hurst*, 846 P.2d 1282, 1284 n.2 (Utah 1993) (holding that "an appellate court does not, as a matter of course, resolve all conflicts in the evidence in favor of the appellee" when findings were made by a judge); *Walker*, 743 P.2d at 193 (noting that "it is not accurate to say that the appellate court takes that view of the evidence that is most favorable to the appellee" when reviewing findings of the court (quotation simplified)). But other Utah cases—including some from our court that reviewed adjudications from juvenile court delinquency proceedings—say yes. *See, e.g., State v. Layman*, 1999 UT 79, ¶¶ 12–13, 985 P.2d 911 (holding that when "reviewing a conviction, an appellate court should consider the facts in a light most favorable to the verdict," and then applying that standard to a ruling from "the trial judge, who was the finder of fact" in the bench trial at issue); *In re J.R.H.*, 2020 UT App 155, ¶ 9, 478 P.3d 56 (applying the "light most favorable" standard to a juvenile court adjudication (quotation simplified)); *In re V.T.*, 2000 UT App 189, ¶ 8, 5 P.3d 1234 (relying on *Layman* for the proposition that "[w]hen reviewing a juvenile court's decision for sufficiency of the evidence, we must consider all the facts, and all reasonable inferences which may be drawn therefrom, in a light most favorable to the juvenile court's determination"); *see also In re C.C.R.*, 2011 UT App 228, ¶ 10, 257 P.3d 1106; *In re M.B.*, 2008 UT App 433, ¶ 5, 198 P.3d 1007.

¶29 We need not resolve this conflict here. Again, the parties at least agree that K.S. can only prevail on his sufficiency challenge if he establishes that the verdict was against the clear weight of the evidence, or, instead, if we reach a definite and firm conviction that a mistake has been made. And the parties further agree that we give "due regard" to the juvenile court's opportunity to "judge the credibility of witnesses." Utah R. Civ. P. 52(a)(4). For the reasons set forth below, we affirm the juvenile court's adjudication under these agreed-upon standards alone. We accordingly leave for another day (and, more likely, another court) the question of how to resolve the tension in the cases about whether the additional deferential gloss that applies to jury verdicts should apply to juvenile court decisions as well.

ANALYSIS

¶30 K.S. argues there was "insufficient evidence that [he], as opposed to someone else, caused the injuries that resulted in A.M.'s death." We disagree.

¶31 The State's case against K.S. relied on the interplay between three propositions: (i) A.M. died from an injury to her brain that was caused by violent force; (ii) A.M.'s symptoms would have manifested very quickly after the injury was inflicted; and (iii) K.S. was alone with A.M. immediately prior to the symptoms' initial appearance. There was competent testimony to support each of these propositions.

¶32 **Injury.** All three medical experts agreed that A.M. died from a brain injury that was caused by violent force. Dr. Thorn testified that A.M.'s injury would have been caused by "[e]xtremely violent" force or a "violent, blunt act," such as the "shaking back and forth of a child's brain." In his view, this was "not an accidentally dropped child." Dr. Hatch similarly testified that a significant amount of force would have been required, either "shaking by itself," or shaking combined "with some form

of impact," or "impact by itself." He added that doctors "don't observe these kinds of injuries from falls" or even from "significant" car accidents. Dr. Hatch believed anyone "who witnessed an incident like this occur would know that the force was excessive and that an injury was likely" to follow. Finally, Dr. Christensen testified that the injury was "not consistent with having occurred accidentally" and that the force involved would have been "noticeably violent."

¶33 **Timing of symptoms.** There was also testimony from medical experts that A.M.'s symptoms would have manifested very quickly after the force that caused the fatal injury. Dr. Hatch testified that "the head injury immediately preceded the development of any symptoms that [A.M.] had" and that the "medical literature would support that in almost all cases with this severe of an injury," the resulting symptoms would appear "immediately afterward." Dr. Christensen similarly testified that with "traumatic axonal injury, you would expect [A.M.] to be symptomatic essentially immediately." He added: "It's not going to be the kind of thing where she is going to be normal for a few hours . . . . It's a global insult to the brain that is going to manifest as . . . abnormal behavior very soon after infliction."[3]

¶34 **K.S. was alone with A.M.** Finally, there was testimony establishing that K.S. was alone with A.M. immediately before the symptoms' initial appearance. Mother and Father both testified

---

3. As discussed both above and again below, Dr. Thorn was more equivocal about this. But even so, Dr. Thorn opined that the fatal injury could have "potentially" been inflicted "almost right before" K.S. filmed the video that he sent to Mother, and he also testified that A.M. "was very, very sick at the time that that video was taken." Thus, while Dr. Thorn may not have fully embraced the other doctors' opinions about how quickly the injury would have led to symptoms, he did not dispute that their view could have been consistent with this evidence.

that A.M. was in good health that morning. Father stated that after a few days of being fussy, A.M. was "feeling a little better" and that there was "nothing out of the ordinary." Mother also testified that A.M. was "cheery, smiling, [and] glowing" that morning.

¶35 Mother left for work by 9:30 a.m., and at trial, Father testified that he left for work between 8:30 and 8:45 a.m. (though there was some suggestion that he may have left at 10:55 a.m.). At some point between 11:36 and 11:56 that morning, K.S. sent Mother a video showing A.M. with limp limbs and having difficulty breathing.

¶36 The collective import of these propositions is clear. Since K.S. was alone with A.M. for at least a half hour (if not several hours) before A.M.'s symptoms appeared, and since two medical experts testified that A.M.'s symptoms would have appeared very quickly (if not immediately) after the infliction of the injury, it stands to reason that K.S. caused the fatal injury. This would provide a basis to sustain the adjudication.[4]

¶37 K.S. nevertheless argues that there was insufficient evidence to support the adjudication because of various problems with the above evidence and with other aspects of the State's case.

---

4. The State also pointed to the text K.S. sent to Father the following day in which he wrote, "if it weren't for my laziness and wanting to relax [A.M.] wouldn't be like this and if i had never tossed her up in the air to try and cheer her up im so so sorry." In his brief, K.S. correctly points out that this text doesn't contain an admission to having used any force against A.M., let alone the kind of violent force described by the experts. But even so, the State argues that the text shows that K.S. had done something to the child that was forceful enough to lead K.S. to believe that he had caused her injury. While we don't regard this text as having particularly strong probative value, we acknowledge that it at least marginally supports the State's theory of the case.

While we certainly agree that there was conflicting evidence on certain points, the problems that K.S. identifies are not so conclusive that we can overturn the adjudication as a result.

¶38    Much of K.S.'s argument is focused on ambiguities in the record about the critical question of timing. K.S. points out that while Dr. Christensen opined that the symptoms likely manifested soon after the injury, Dr. Christensen also acknowledged that "those things"—apparently meaning medical conclusions about the time at which an injury occurred—"are not precise." K.S. also relies heavily on Dr. Thorn's testimony that the injury could have occurred anywhere from "almost right before" the symptoms appeared to "hours" earlier. And K.S. further points to Dr. Thorn's testimony that he didn't think "you could find anyone else that would be able to comment as to a more definitive timeframe."

¶39    But when Dr. Thorn opined that he didn't think that "anyone else" could provide "a more definitive timeframe," Dr. Thorn was mistaken. As discussed, the State called two medical experts—Dr. Christensen and Dr. Hatch—who each testified under oath that they thought that A.M.'s symptoms would have appeared very quickly (if not immediately) after the fatal injury was inflicted. And to the extent that there was any conflict between the experts' conclusions on this, the juvenile court was in a better position than we are to determine which version to believe. *See, e.g.*, *In re M.M.*, 2023 UT App 95, ¶ 35 n.9, 536 P.3d 102, *petition for cert. filed*, October 25, 2023 (No. 20230944) (recognizing that it "is the role of the juvenile court, not this court, to assess the weight and credibility of expert witnesses and to choose among their testimonies" (quotation simplified)); *Knowlton v. Knowlton*, 2023 UT App 16, ¶ 59 n.13, 525 P.3d 898 (noting that a trial court "is in the superior position to assess the weight of evidence," including questions about which expert's testimony to accept), *cert. denied*, 531 P.3d 730 (Utah 2023); *Woodward v. Lafranca*, 2016 UT App 141, ¶ 13, 381 P.3d 1125

(noting that a "fact-finder is in the best position to judge the credibility of witnesses and is free to disbelieve their testimony, even if that testimony comes from an expert witness" (quotation simplified)).

¶40    K.S. also points to testimony showing that Mother left for work by 9:30 a.m., as well as testimony that Father told a detective that he didn't leave until 10:55 that morning. Since K.S. maintains that the window in which the injury could have been inflicted was several hours long, K.S. posits that Mother or Father could have inflicted the injury before they left for work. But again, on the question of timing, Dr. Christensen and Dr. Hatch both spoke of symptoms appearing very quickly after the fatal injury was inflicted. This testimony, alone, undermines this theory, and the juvenile court was entitled to credit it.

¶41    And there are other problems with this theory too. After all, K.S.'s suggestion that Mother or Father caused the injury that morning or overnight is at odds with their sworn testimonies. Again, both of them testified under oath that A.M. was healthy when they left the house. And it also seems possible (if not probable) that K.S. would have noticed something if Mother or Father had used violent force against A.M. that morning—after all, he'd spent the night there and was at the house all morning. But K.S. never claimed to have heard or witnessed either parent injuring A.M. earlier that day. Thus, to have accepted this theory, the court would have had to discredit the injury-to-symptoms chronology testimony of two medical experts, disbelieve the testimonies of Mother and Father, and then infer that Mother or Father had used violent force against A.M. without K.S. noticing or deciding to comment on it.

¶42    K.S. also points to evidence suggesting that A.M. had sustained a prior brain injury sometime before May 7, and he then argues that this prior injury might have been responsible for A.M.'s death. But while Dr. Christensen and Dr. Thorn both

believed that A.M. had suffered multiple injuries, Dr. Hatch thought it was possible that there weren't two injuries at all. Regardless, even assuming that the earlier injury did occur, K.S. could have inflicted that injury too given that he'd been babysitting for weeks. And more to the point, Dr. Christensen testified that the earlier injury wasn't the cause of death. Dr. Christensen explained that both the earlier injury and the later injury had caused "subdural hemorrhage[s]" but that a subdural hemorrhage "didn't ultimately lead directly to the child's death." Instead, Dr. Christensen testified that "diffuse axonal injury" in the brainstem created "respiratory compromise" that led to "brain swelling and ultimately death." And when the prosecutor asked Dr. Christensen whether the "fatal" or "ultimately fatal" injury occurred close in time to A.M. arriving at the hospital, Dr. Christensen agreed with the State's timeline. He reiterated that after the infliction of the "traumatic axonal injury," which he had previously identified as the ultimate cause of death, symptoms would appear "essentially immediately."[5]

¶43 Finally, K.S. points to various problems with the version of events offered by Mother and Father, including Mother's decision not to take the baby to the hospital that afternoon, Father's seemingly odd storytelling while waiting for detectives that night, and certain discrepancies between the parents' initial statements to officers and their testimonies at trial. We've reviewed the record and acknowledge the potential problems identified by K.S. But these problems all go to the perceived credibility (or lack thereof) of Mother and Father, particularly as it relates to their sworn testimonies that they did not injure their child. Our

---

5. In response to questioning from K.S.'s counsel, Dr. Christensen acknowledged that A.M.'s "prior symptoms" could be "related to a "prior head injury." But in Dr. Christensen's understanding, A.M.'s "prior" symptom was vomiting—not respiratory compromise. Notably, the ER doctor who treated A.M. on May 2 found that A.M.'s oxygen saturation levels were "reassuring."

supreme court, however, has directly cautioned the appellate courts to avoid second-guessing lower courts about credibility issues like these. As the court explained in *In re Z.D.*:

> Appellate courts are removed temporally and geographically from trial courts. They do not see juries impaneled or oaths administered to witnesses. They do not view first-hand witnesses' "tells" of posture, inflection, or mood that strengthen or erode credibility. It is the lot of appellate judges to take their sustenance from the printed page; to peer into the facts as deeply as the flat plane of paper will permit. By the time the trial transcript reaches the hands of the appellate judge, the universal adjective describing its condition is "cold."

2006 UT 54, ¶ 24, 147 P.3d 401. It's of course possible that the court could have chosen to disbelieve the testimonies of Mother and Father. But given its adjudication, it's clear that the court did accept their accounts (or, at least, those portions that suggested that it was K.S., not Mother or Father, who inflicted the fatal injury on A.M.). Without something more, it's not our place to second-guess that determination.

¶44 In short, this evidentiary picture could certainly have been clearer, and we do see this as something of a close case. But the fact that it's a close case is the reason we shouldn't overturn this adjudication. In *In re Z.D.*, our supreme court stressed that an "appellate court must be capable of discriminating between discomfort over a trial court's findings of fact—which it must tolerate—and those that require the court's intercession. It must forebear disturbing the 'close call.'" *Id.* ¶ 33. And again, under even the standard of review that both parties agree on, K.S. must convince us that the verdict was against "the *clear weight* of the evidence," or, instead, we must be left with "a *definite and firm*

conviction that a mistake has been made." *State v. Walker*, 743 P.2d 191, 193 (Utah 1987) (emphases added, quotations otherwise simplified).

¶45 On this record, the juvenile court could have sided with K.S. based on certain evidence about the timing of the injuries and who was around A.M. during a potentially relevant window. But the State's narrower view of the timing window was backed by two medical experts, and its view of who was where and when was backed by sworn testimony as well. And under the State's evidence, K.S. was the only person who could have caused the fatal injury.

¶46 Unlike members of this court, the juvenile court observed the relevant testimony firsthand. As a result, it was in a better position than we are to evaluate the credibility of that testimony and make determinations about the key facts. While K.S. has highlighted some problems with the State's case, we don't see those problems as being so pronounced that the court's decision was against the clear weight of the evidence, nor are we left with a definite and firm conviction that a mistake has been made. We accordingly see no basis for overturning this adjudication.

## CONCLUSION

¶47 There was sufficient evidence to support the juvenile court's adjudication that K.S. committed child abuse homicide. The adjudication is therefore affirmed.