**2024 UT App 135**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF S.M.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

S.M.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20230172-CA
Filed September 19, 2024

Third District Juvenile Court, West Jordan Department
The Honorable Elizabeth A. Lindsley
No. 1203299

D. Grant Dickinson, Attorney for Appellant

Sean D. Reyes and Daniel W. Boyer, Attorneys
for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and JOHN D. LUTHY concurred.

TENNEY, Judge:

¶1      In August 2021, two children accused S.M. (a minor) of inappropriately touching them while S.M. was babysitting them. Following a bench trial at which both children testified, the juvenile court found that S.M. had committed two counts of aggravated sexual abuse of a child, and the court then adjudicated her delinquent as a result. S.M. now appeals, arguing that (1) the children's claims were inherently improbable and there was accordingly insufficient evidence to support the adjudication, and (2) her counsel was ineffective for not requesting a continuance of the trial. Contemporaneous with her brief, S.M. also filed a motion

under rule 23B of the Utah Rules of Appellate Procedure, asking for a remand to further investigate her ineffective assistance claims. For the reasons set forth below, we affirm the juvenile court's adjudication and deny S.M.'s request for a remand.

BACKGROUND

*Underlying Allegations*

¶2 On August 12, 2021, S.M. babysat three siblings for a few hours, something that S.M. had frequently done over the previous two years. S.M. was thirteen years old at the time (though she was just a month shy of her fourteenth birthday), and the children she babysat—A.A., C.A., and L.A.—were eight, six, and three years old, respectively.

¶3 When S.M. arrived at the house around 4 p.m., the children's mother (Mother) told S.M. that "A.A. had an earache, so [they] could just watch a movie" while she was gone. After Mother left, S.M. took the children to an upstairs playroom to watch the movie.

¶4 S.M. watched the children for approximately two hours. When Mother arrived back home around 6 p.m., A.A. "immediately" came downstairs and "just hugged [her] for a really long time." S.M. came down "right behind her," and after talking to Mother for a minute, S.M. left. The "second [S.M.] shut the door," A.A. told Mother that S.M. had "touched [her] vagina." Mother was "just in shock" upon hearing this, and she and A.A. then "talked in the kitchen for a minute" about what A.A. had said. At that point, C.A. "came running down the stairs" and said, "S.M. touched my privates." Mother later testified that because of where C.A. had been in the house, she was "certain" that C.A. "couldn't have heard" A.A. when A.A. told Mother that S.M. had abused her.

¶5    Mother did not "immediately call the police" or Utah's Division of Children and Family Services (DCFS), later explaining that she "was in shock" and "just didn't know" what to do. Instead, Mother took A.A. to a doctor's appointment that she had previously scheduled for A.A.'s earache. At trial, Mother testified that she "told the doctor everything about what happened" with "the alleged sexual assault" and that the doctor "told [her] to call the police." But Mother also said that she informed the doctor that the two families were friends and neighbors, so she "wanted to talk to S.M.'s parents" before she made an official report so that they could know what was happening "before they had the police just show up at their house."

¶6    Later that evening, Mother sent S.M.'s mom a text message asking if they could meet the next day. Mother did not tell S.M.'s mom the purpose of the meeting, but she did indicate it was "serious" while also stating that she "didn't want to alarm" her. Shortly after sending this text, Mother received an unsolicited text message from S.M. that read as follows:

> I saw that you were texting my mom and I just want you to[] know that if I did anything I didn't mean to do it. I promise.

¶7    Mother met with S.M.'s parents the following day and told them about A.A.'s and C.A.'s allegations. Mother also told S.M.'s parents that she would be reporting the incident to DCFS. Before Mother could actually report the allegations to DCFS, however, she received a call from DCFS, and DCFS investigators then came to her house that same day to discuss the matter. Mother later testified that she did not know who had made the initial report to DCFS.

¶8    A day or two later, Mother and her family went on a pre-planned out-of-state vacation. Mother later said that she was unable to "schedule a meeting" with anyone from law enforcement before leaving because "nobody was available."

After returning from vacation about two weeks after S.M. had babysat the children, A.A. and C.A. were separately interviewed at a Children's Justice Center (CJC).

¶9    During A.A.'s interview, which was recorded and later played at trial, A.A. told the CJC investigator that while S.M. was babysitting her, S.M. had "touched [A.A.'s] private area" and had also kissed both A.A. and L.A. (A.A.'s three-year-old brother) on the lips. A.A. told the investigator that she had been "wearing a leotard" that night because she was supposed to go to gymnastics but that she had stayed home because her "ear hurt too much." A.A. told the investigator that while they were upstairs, she was lying on the couch next to S.M. watching the movie when S.M. reached "through the top" of her leotard and touched her chest. A.A. then said that after S.M. touched her through the top of her leotard, S.M. "got her hand out and then she went [through] the bottom" and touched A.A.'s "private parts." When the investigator asked A.A. if those private parts "have another name," A.A. responded that she "[didn't] want to talk about it." But A.A. told the investigator that she uses those private parts to "go potty."

¶10    A.A. told the investigator that she asked S.M. to "[s]top it" but that S.M. "didn't stop," and A.A. also said that she "tried to . . . cover" herself but that S.M. "wouldn't let [her]." A.A. said that she wanted to use the family's "Alexa" to call Mother, but that S.M. prevented her from going downstairs where the Alexa was so A.A. was unable to make a call.[1] According to A.A., it was only when they "heard the garage open" that S.M. stopped touching her. Once the garage door opened, A.A. said that S.M. "kissed [her]" on the lips and then kissed L.A. as well before going

---

1. An "Alexa" is a device whose capabilities include the ability to make voice-activated phone calls. *See* https://en.wikipedia.org/wiki/Amazon_Alexa [https://perma.cc/AU3F-EQRZ].

downstairs to talk to Mother. When asked how she felt when S.M. touched her, A.A. told the investigator that it made her feel "sad and mad and really awkward" and "yucky."

¶11 During C.A.'s CJC interview, which was also recorded and played at trial, C.A. told the investigator that while she was watching a movie with S.M., S.M. had "put up [C.A.'s] dress and then touch[ed her] private parts." C.A. said that she kept "saying stop" but that S.M. kept "going longer and longer." When asked about the "private parts" that S.M. touched, C.A. told the investigator it was her "vagina" and "butt." C.A. said that this made her "sad and mad." C.A. also said that after S.M. touched her private parts, she went and "laid on the ground and fell asleep." She also told the investigator that her sister, A.A., was telling S.M. to "stop." While C.A. indicated that she thought S.M. was touching her private parts and A.A.'s private parts at the "same time," she was less clear about whether she actually saw S.M. touching A.A.

¶12 Midway through the interview, the investigator told C.A. that she would be "going away for just a few minutes" and that while she was away, she wanted C.A. "to stay in [the room] and think about if there's something [she] forgot to ask" or if there was "something that [C.A.] forgot to tell [her] about." As soon as the investigator returned, C.A. said that there was something she "meant to tell [the investigator] about," which was that Mother had "left her phone, so [they] can call her," and that when S.M. had "touched [her] private part, [she] went to call [Mother], and A.A. did too." According to C.A., she then "went to get it and called" Mother, after which Mother came home and "the babysitter left."

*Petition and Trial*

¶13 A few months later, the State filed a petition with the juvenile court alleging that S.M. had committed two counts of aggravated sexual abuse of a child.

¶14 On November 11, 2022, counsel for S.M. (Counsel) requested "[a]ll medical documents for [A.A.'s] visit to the doctor on August 12, 2021." Counsel did not receive the medical records he requested until January 17, 2023, which was just a few days before the scheduled trial.

¶15 A two-day bench trial was then held the following week. During its case in chief, the State called five witnesses to testify: A.A., C.A., Mother, and the two CJC interviewers. The State also played both CJC interviews for the court. During the defense case, Counsel called S.M. and S.M.'s mom to testify, as well as an expert witness to "address specific child interview issues along with police policy and procedure issues." Counsel also recalled Mother to the stand to ask some additional questions that he had been unable to ask during cross-examination. Below, we highlight the portions of the witnesses' testimonies that are relevant to this appeal.

¶16 A.A., who was nine years old at the time of the trial, was asked by the State "why" she was in court that day, and she responded that she was there "[b]ecause S.M. touched our private parts, and that was not okay." A.A. testified that the touching had happened in the "playroom" while she was on the couch with S.M., and she further explained that she "had [her] leotard on" because she was about "to go to gymnastics" but that she did not end up going. A.A. testified that "C.A. was asleep like half of the time" that S.M. was babysitting, and A.A. said she didn't think she ever saw "S.M. touch C.A." A.A. further testified that when she told Mother about what happened right after S.M. left, C.A. was "upstairs" and would not have "been able to overhear" A.A. tell Mother about the abuse.

¶17 C.A., who was seven years old at the time of the trial, testified during her direct examination that she was in court that day "[b]ecause when [she] was babysat," S.M. touched her "privates." During cross-examination, C.A. reiterated that "the

babysitter touched [her] privates." When Counsel asked C.A. whether she saw S.M. "touch A.A.'s privates," C.A. responded, "No, but I know she did because A.A.—we both went downstairs to call" Mother. Counsel then asked C.A. whether S.M. touched her and A.A. "at the same time," and C.A. responded:

> Yeah, we were both like on the couch, and she said she would itch me, but then she didn't itch me. She touched my privates. And A.A., I don't know how, but she just touched the private. It was like at the same time.

¶18 When Counsel asked C.A. about where (and how) she was sitting when S.M. touched her, C.A. used her teddy bear and demonstrated how she was sitting, explaining to the court as she did about how her legs were "up against the armrest." C.A. testified that, before S.M. touched her private parts, S.M. was scratching her back because she was "always itchy." Counsel then asked C.A. to explain how S.M. could scratch her back if C.A. was lying on her back. In response, C.A. stated, "Well, not my back. Like laying on my arm. It was my arm. Well, she just said scratch me anywhere, so I asked her to scratch my arm."

¶19 Mother testified to the events described above. As part of this testimony, she said that S.M. would babysit while she would "run errands or go on a date night." She then explained how, in "August of 2021," A.A. and C.A. told her that they had been touched inappropriately by S.M. Mother testified that while S.M. was babysitting on that particular night, neither A.A. nor C.A. had called her "using the Alexa." During cross-examination, Counsel asked Mother to provide some details about the couch that the girls were on when the alleged abuse took place. When Counsel asked "how long" the couch was, Mother responded that it was "like five feet" but that she "[didn't] know" and she "really couldn't tell." Mother then testified that A.A. and C.A. could both

"lay out easily" on the couch even with her "sitting . . . in the middle."

¶20    Mother also testified about the visit to the doctor that occurred later that night, and in doing so, she agreed that she "told the doctor everything about what happened." In his cross-examination of Mother, Counsel attempted to introduce a medical record that was created by the doctor during that visit. The State objected on hearsay grounds, and in doing so, it pointed out that there had not been "any testimony from the doctor." Counsel argued in response that the medical record qualified as "a business record," and Counsel further asserted that he would have "called the doctor to come and testify" but that he had only received the record "two days ago." Counsel explained he wanted to introduce the record to "show[] the absence" of any report of sexual abuse. Alternatively, Counsel said that if the court would not allow admission of the medical record, Counsel would "ask for a continuance so [he could] bring the doctor in to testify about the contents" and lay foundation. After these brief arguments, the court ruled that the medical record was inadmissible, citing both the hearsay rule and a lack of foundation. The court then stated that if Counsel "need[s] a continuance for the doctor," that could be addressed when it came time for Counsel to put on the defense case. But during the defense case, Counsel never asked for a continuance, nor did Counsel seek to call the doctor or anyone from the doctor's office as a witness.

¶21    When S.M.'s mom testified, she recounted the text messages that Mother sent her after S.M. had babysat Mother's children. S.M.'s mom also testified that Mother had told her, at their meeting the next day, that "the girls had been abused at the same time." This testimony was similar to a claim made by one of the CJC investigators, who testified at trial that she "believe[d]" that in the initial report, there had been a statement indicating that "A.A. explained to [Mother] that S.M. had A.A. on one side of her

and C.A. on the other side" and that S.M. "was touching them both at the same time."[2]

¶22　S.M., who was fifteen years old at the time of the trial, testified on her own behalf. S.M. said that on the date in question, she arrived to babysit around 4 p.m. and that she stayed for approximately two hours, watching a movie with the three children. S.M. said that during the movie, she was "sitting in the middle of the couch" with A.A. "scrunched up to one side" with her head on a pillow and C.A. "laying next to [her] just scrunched up on the other side." S.M. also said that C.A. was "sitting next to [her]" on the couch for part of the movie, and that C.A. then moved to "lay[] on the floor in front of the TV." S.M. further said that A.A. was on the couch next to her "most of the time" with "her head on a pillow close to [S.M.'s] knees." According to S.M., the girls never "ask[ed] to call" Mother while she was babysitting, nor did they ever "try to go downstairs."

¶23　S.M. denied ever "stick[ing] her hand underneath the leotard of A.A.," "stick[ing] her hands under [C.A.'s] dress," or inappropriately touching the girls either on top of or underneath their clothing at any time. As for the text message that S.M. sent Mother later that night, S.M. explained that she saw that Mother was "texting [her] mom," and although she then texted Mother saying that "if [she] did anything" she "didn't mean to," S.M. was not "admitting to any wrongdoing" in that message. S.M. also testified that when she sent that message to Mother, she had no

---

2. In contrast to this testimony (i.e., the testimony from S.M.'s mom and the investigator about having heard claims that the girls were abused simultaneously), Mother testified that she did not remember A.A. being very "descriptive" about whether she saw C.A. being abused or not, and Mother also testified that C.A. did not "say anything about A.A. being abused."

idea that Mother "wanted to talk to [S.M.'s mom] about sexual abuse" of A.A. and C.A.

¶24 At the conclusion of the trial, the juvenile court indicated that it would take the matter under advisement. A short time later, the court held a hearing and announced the verdict. The court began by finding "the testimony of A.A. and C.A. to be credible." Then, "[b]ased upon the evidence presented at trial," the court found that the State had "met its burden of proof beyond a reasonable doubt as to the allegations," and it then adjudicated S.M. delinquent for the two counts of aggravated sexual abuse of a child.

## ISSUES AND STANDARDS OF REVIEW

¶25 S.M. raises two issues on appeal. First, S.M. argues that there was "insufficient evidence to prove" that she committed the charged offenses "beyond a reasonable doubt." "When reviewing a juvenile court's decision for sufficiency of the evidence, . . . we reverse only when it is against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made." *In re J.R.H.*, 2020 UT App 155, ¶ 9, 478 P.3d 56 (quotation simplified); *see also In re K.S.*, 2023 UT App 138, ¶ 26, 540 P.3d 705.[3]

---

3. When "review[ing] a jury's verdict, [this] court views the evidence and all reasonable inferences in the light most favorable to the verdict," but we've recently recognized that "there's a divergence in Utah's caselaw" as to whether we should do "the same when reviewing a verdict from a bench trial." *In re K.S.*, 2023 UT App 138, ¶ 28, 540 P.3d 705; *compare Bountiful City v. Sisch*, 2023 UT App 141, n.1, 540 P.3d 1164 ("On appeal from a bench trial, we view and recite the evidence in the light most favorable to the trial court's findings; we present additional evidence only

(continued…)

¶26    Second, S.M. claims that Counsel was "ineffective in not seeking a continuance" so that Counsel could further investigate A.A.'s doctor's visit. When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of effective assistance of counsel as a matter of law. *See State v. Grover*, 2022 UT App 48, ¶ 31, 509 P.3d 223.

¶27    Contemporaneous with her brief, S.M. has filed a motion for a remand under rule 23B of the Utah Rules of Appellate Procedure. A remand under rule 23B is "available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B(a).

ANALYSIS

I. Direct Appeal

¶28    In her direct appeal, S.M. raises two issues. First, she argues that A.A.'s and C.A.'s claims were "inherently improbable" and that the juvenile court therefore should have found them "not credible." If the testimonies of A.A. and C.A. are removed from

---

as necessary to understand the issues on appeal." (quotation simplified)), *with In re Z.D.*, 2006 UT 54, ¶ 35, 147 P.3d 401 ("An appellate court must indulge findings of fact made by a jury that support the verdict. No such indulgence is required of findings made by a judge.").

But we need not resolve this conflict here. All parties agree that S.M. can only prevail on her insufficiency claim if she shows that the verdict was "against the clear weight of the evidence," or, instead, if we reach "a definite and firm conviction that a mistake has been made." *In re J.R.H.*, 2020 UT App 155, ¶ 9, 478 P.3d 56 (quotation simplified). As explained below, S.M.'s claim fails under these accepted standards.

the evidentiary picture, S.M. argues that there would then be insufficient evidence to support the adjudications. Second, S.M. argues that Counsel was "ineffective in not seeking a continuance" so that Counsel could investigate A.A.'s visit to the doctor on the day of the incident.

A.      Sufficiency of the Evidence

¶29    S.M. asserts that A.A.'s and C.A.'s claims are inherently improbable and could not be relied on by the juvenile court. Since the State's case was largely reliant on those claims, S.M. then asserts that there was insufficient evidence to support her delinquency adjudications.

¶30    Appellate courts ordinarily "do not make credibility determinations," instead typically "resolving any such conflicts in the evidence in favor of the . . . verdict." *State v. Jok*, 2021 UT 35, ¶ 28, 493 P.3d 665 (quotation simplified); *see also State v. Workman*, 852 P.2d 981, 984 (Utah 1993). "This is because the factfinder serves as the exclusive judge of both the credibility of witnesses and the weight to be given particular evidence." *Jok*, 2021 UT 35, ¶ 28 (quotation simplified).

¶31    In what "has become known as the inherently improbable doctrine," our supreme court has recognized that "in rare cases," an appellate court "may disregard" testimony if the court determines that the testimony was "so incredibly dubious or inherently improbable that it could not support a conviction." *Id.* ¶ 31. "Because other evidence may support testimony that would otherwise be considered improbable on its own, . . . testimony will generally be disregarded only when no corroborating evidence exists." *Id.*

¶32    When a defendant raises a claim under the inherently improbable standard, appellate courts "consider the situation as a whole, including the context in which the testimony was offered." *State v. Barnes*, 2023 UT App 148, ¶ 24, 542 P.3d 108, *cert. denied*,

544 P.3d 459 (Utah 2024). When reviewing an inherent improbability claim, we often look to three "examples" of what would make testimony inherently improbable. *Jok*, 2021 UT 35, ¶ 32. These are "material inconsistencies, patent falsehoods, and lack of corroborating evidence." *Id.* But while these three examples "are beneficial, they are not controlling." *Id.* ¶ 36. And the ultimate question in an inherent improbability analysis is whether "the testimony of the witness . . . run[s] so counter to human experience that it renders the testimony inappropriate for consideration in sustaining a finding of guilt." *Id.* (quotation simplified); *see also Barnes*, 2023 UT App 148, ¶ 23.

¶33 We've previously cautioned, however, that a "micro-focus on the elements of the inherent improbability exception often leads to legal myopia where the ultimate question—whether a reasonable jury could find a defendant guilty beyond a reasonable doubt—is lost in the details." *State v. Rivera*, 2019 UT App 188, ¶ 23 n.6, 455 P.3d 112. In this sense, this doctrine is not satisfied by "generalized concerns about a witness's credibility." *State v. Robbins*, 2009 UT 23, ¶ 19, 210 P.3d 288 (quotation simplified). The mere "existence of a conflict in the evidence" is generally not enough, *Rivera,* 2019 UT App 188, ¶ 34 (quotation simplified), nor is this standard satisfied where the appellant raises "garden-variety credibility questions, such as which witness to believe, or which version of a witness's conflicting account to believe." *In re J.R.H.*, 2020 UT App 155, ¶ 11, 478 P.3d 56.

¶34 Here, A.A. and C.A. each claimed in at least three separate reports that S.M. had abused them: (1) immediately afterward, when they each reported the abuse to Mother; (2) two weeks later during their separate CJC interviews; and (3) nearly a year and a half later, when each of them described the abuse while testifying under oath at trial. What's more, Mother testified that when A.A. first reported that she had been abused, C.A. was "upstairs" and "couldn't have heard" A.A.'s allegations before she "came running down the stairs" and reported that "S.M. touched [her]

privates." And we also note that S.M. sent an unsolicited text to Mother that night stating, "I saw that you were texting my mom and I just want you to[] know that if I did anything I didn't mean to do it. I promise." Though certainly not conclusive on its own, this unsolicited text message was inferentially suggestive that S.M. recognized that something inappropriate had occurred, and this inference is particularly warranted when the text message is viewed alongside what the girls had already told Mother outside of S.M.'s presence.

¶35    Despite all this, S.M. argues that the claims from A.A. and C.A. were inherently improbable. In doing so, S.M. points to three alleged problems with their accounts.

¶36    In S.M.'s view, the first problem has to do with where the girls were during the alleged abuse. In their testimonies, S.M.'s mom and one of the investigators both said that Mother had said that one or both of the girls had reported that both girls were abused simultaneously while lying on the couch. In her appellate brief, S.M. then points to Mother's testimony that the couch was "five feet in length," and S.M. accordingly argues that the girls' claims were inherently improbable because they "could not have fit on the couch with each child laying straight out or flat out."

¶37    There are a number of problems with this argument. As an initial matter, and to the extent that this argument turns on the alleged positioning of the girls during the abuse, S.M.'s claim relies on triple hearsay—it's based on what S.M.'s mom and the investigator claim to have heard from Mother about what she heard from the girls. For this reason alone, S.M.'s attack on the credibility of the girls' accounts suffers from its own evidentiary infirmity. We also note that it's not clear from the record exactly how long the couch actually was. Immediately after Mother said the couch was "like five feet," she clarified that she "really couldn't tell" and "[didn't] know" its exact length. And perhaps most importantly, S.M.'s argument is contradicted by testimony

that was presented at trial indicating that it *was* possible for both girls to lie on the couch in this manner. Mother testified that A.A. and C.A. could both "lay out easily" on the couch, even with Mother "sitting . . . in the middle." And S.M. herself testified that she watched the movie with the girls while "sitting in the middle of the couch" with A.A. lying on one side and C.A. lying on the other. Since the couch's owner and S.M. both acknowledge that this was positionally possible, there's simply no basis for us to conclude on appeal that it was inherently improbable that the girls could have sat on the couch in the manner they described— much less that this improbability was such that their testimonies about the abuse must be disregarded.

¶38    S.M.'s next argument focuses on the portions of testimony from C.A. and A.A. in which each of them said that they did not see S.M. touch the other. Because A.A. and C.A. were together the entire time, S.M. argues it was "inherently improbable that they would not witness the touching" of each other.

¶39    In C.A.'s CJC interview, however, C.A. said that A.A. was asleep while S.M. was touching her, which would have provided an explanation for why A.A. did not see S.M. abusing C.A. In any event, there is no dispute that the girls and S.M. were watching a movie that night, so it would have been entirely possible that the girls' attentions were directed toward the television and not each other. And there was no testimony, not even from S.M., that A.A. and C.A. were facing each other at any particular time, much less the entire time. And there was also testimony that C.A. was sitting on the floor (and not on the couch) for at least part of the movie. In light of all this, we see nothing that would make it inherently improbable that the girls could have each been touched inappropriately without seeing the abuse of the other sister.

¶40    Finally, S.M. claims that "[b]oth A.A. and C.A. testified that they called" Mother while S.M. was babysitting and that they reported the abuse in these phone calls. Because Mother testified

that she "never received such a call" while she was out that afternoon, S.M. claims that the testimonies from A.A. and C.A. were not credible and could not be relied on by the juvenile court.

¶41 We first note that S.M. misstates the record on this point regarding A.A.'s account. Contrary to S.M.'s assertion, A.A. never said that she made a call to Mother. Instead, during both her CJC interview and again in her trial testimony, A.A. said that she wanted to call Mother, that S.M. prevented her from going downstairs, and that she was thus unable to make any call. As for C.A., however, it does appear that her testimony on this point contradicted Mother's testimony. C.A. said during both her CJC interview and again at trial that she had reported the abuse to Mother over the phone that night. And this conflicts with Mother's testimony that she did not receive such a call.

¶42 But even so, we don't regard this as the kind of thing that would render C.A.'s claims inherently improbable. As we've previously noted, "it is not unusual for a child to testify somewhat inconsistently, especially in sexual abuse cases," and inconsistencies in a victim's testimony can "be explained by" the victim's "age and lack of sophistication." *State v. Klenz*, 2018 UT App 201, ¶ 78, 437 P.3d 504 (quotation simplified); *see also Robbins*, 2009 UT 23, ¶ 22 (stating that the child victim's "inconsistent accounts regarding the extent of the physical abuse she suffered, her age when the abuse occurred, and what she was wearing at the time of abuse may alone be insufficient to invoke the inherent improbability exception"); *State v. Wells*, 2014 UT App 13, ¶ 10, 318 P.3d 1251 ("[I]nconsistency alone does not necessarily make a child's testimony inherently improbable."). And again, the inherent improbability standard is not satisfied where the appellant raises "garden-variety credibility questions, such as which witness to believe, or which version of a witness's conflicting account to believe." *In re J.R.H.*, 2020 UT App 155, ¶ 11.

¶43 Here, S.M. isn't pointing to an inconsistency that was internal within C.A.'s testimony. Rather, she's pointing to an apparent conflict in the evidence between C.A.'s testimony and Mother's. But the same principles we've previously identified regarding internal inconsistencies in a child's account would apply with equal force here. To the extent that there is a contradiction, it's one that could be explained by C.A.'s young age or related confusion (i.e., C.A. could have simply confused the moment in which she told Mother about the abuse with some other phone call). In addition, the contradiction in question was not about the abuse itself (i.e., whether it occurred); rather, it was about when C.A. first told Mother about it. As to the abuse itself, however, C.A. gave repeated accounts of what occurred, and each time, she consistently reported that S.M. had touched her inappropriately. In this sense, if she was mistaken, she was mistaken about an issue peripheral to the abuse. *See State v. Kamrowski*, 2015 UT App 75, ¶ 16, 347 P.3d 861 ("[I]nconsistencies with respect to peripheral issues or details . . . will generally not implicate the inherent-improbability doctrine but are matters for the [factfinder] to resolve in assessing the witness's credibility.").

¶44 Again, in such cases, we look to whether there's a *material* inconsistency (or, here, a *material* contradiction), such that the "testimony of the witness . . . run[s] so counter to human experience that it renders the testimony inappropriate for consideration in sustaining a finding of guilt." *Jok*, 2021 UT 35, ¶ 36 (quotation simplified). The juvenile court in this case heard all of the testimony and was thus aware of this contradiction, and yet the court still chose to credit C.A.'s account of the abuse. Given the relatively minor nature of this contradiction (particularly in light of the surrounding context and evidence), we see this as falling far short of the kind of conflict in the evidence that would

support a determination that C.A.'s account as a whole was inherently improbable.[4]

¶45　In short, S.M. has not established that the testimonies of A.A. or C.A. were inherently improbable. We therefore reject S.M.'s argument that the juvenile court should have disregarded those testimonies, and as a result, we likewise reject her assertion that the evidence was insufficient to support the juvenile court's delinquency adjudications.

B.　Ineffective Assistance of Counsel

¶46　S.M. next argues that she received ineffective assistance when Counsel did not "request a continuance" to further "investigat[e] the medical report."

¶47　"An ineffective assistance of counsel claim requires a defendant to show both that (1) trial counsel's performance was deficient, and (2) the deficient performance prejudiced the defense." *State v. Samora*, 2023 UT 5, ¶ 20, 529 P.3d 330. "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address" ineffective assistance claims "under either prong." *Id.* ¶ 21 (quotation simplified). And where "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, we will do so." *Id.* (quotation simplified). Because we determine

---

4. In passing, S.M. suggests that A.A.'s account was also inherently improbable because the medical record from A.A.'s doctor allegedly doesn't mention anything about any report of abuse. As noted above, however, the juvenile court ruled that the medical report was inadmissible and S.M. has not challenged that ruling on appeal. Because of this, we have no evidentiary basis from which we can consider the report for purposes of the direct appeal. This suggestion accordingly fails.

that S.M. has not established prejudice, we do not address whether Counsel's performance was deficient.

¶48    "Prejudice" in the context of an ineffective assistance of counsel claim "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," thus "undermining confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984) (quotation simplified). "Proof of ineffective assistance of counsel cannot be a speculative matter but must be a demonstrable reality." *State v. Munguia*, 2011 UT 5, ¶ 30, 253 P.3d 1082 (quotation simplified). And "to evaluate prejudice, we assess counterfactual[] scenarios—that is, what would have happened but for the ineffective assistance," and "we may do so with the evidence available to us, even when not part of the original record." *Ross v. State*, 2019 UT 48, ¶ 76, 448 P.3d 1203.

¶49    As noted, S.M. argues that Counsel was ineffective for not requesting a continuance to further investigate A.A.'s visit to the doctor on the day of the abuse, and as part of this, she claims that Counsel should have then "obtain[ed] a witness from the doctor's office" during the continuance. In so doing, S.M. surmises that this investigation would have shown that A.A. and Mother never reported the abuse—indeed, S.M. simply surmises "that the doctor's testimony would in fact yield additional inconsistencies."

¶50    But the problem is that there's nothing in the record that supports this. As noted, the medical records themselves were not admitted into evidence, and S.M. has not challenged that decision on appeal. And more importantly, S.M. points to nothing in the record indicating that any witness—whether it be the doctor or anybody else—would have been located during the continuance, much less that such a witness would have testified that A.A. or Mother did not report the abuse. S.M.'s claim is thus based on speculation and fails for lack of demonstrable prejudice. *See State v. Curtis*, 2013 UT App 287, ¶ 54, 317 P.3d 968 ("Proof of prejudice

must be a demonstrable reality, not mere speculation . . . ." (quotation simplified)); *see also State v. Hatch*, 2019 UT App 203, ¶ 36, 455 P.3d 1103 (noting that "when it comes to ineffective assistance of counsel, we will not presume prejudice because it is the defendant's burden to show how counsel's deficient performance prejudiced him").

¶51    We also note that even if such evidence did exist, and even if S.M. had shown that it could have been produced after a continuance, reversal would still only be warranted if the evidence was such that it created a reasonable probability that S.M. would have received a more favorable outcome at trial. But Mother testified under oath at trial that she did report the abuse to the doctor. And there's also some reason to believe that the doctor did report the abuse to authorities after the visit. After all, Mother testified that DCFS visited her home the next day and that she did not know who had alerted DCFS to the girls' allegations, thus suggesting that the doctor had made the call after she left the previous day. Moreover, even if some witness had testified that Mother did not report the abuse to the doctor, the court would still have been left with the repeated and consistent accounts from the girls about the abuse itself. As a result, the missing testimony is not only undefined and speculative, but it's also somewhat tangential to the proof of abuse that was before the court. For these reasons too, S.M.'s claim falls short of establishing prejudice.

¶52    On the record before us for purposes of the direct appeal, we therefore see no reasonable probability that S.M. would have received a more favorable outcome if Counsel had requested a continuance to further investigate the question of whether Mother reported the abuse to the doctor. Because of this, S.M.'s ineffective assistance of counsel claim necessarily fails.

## II. Rule 23B Remand

¶53    Rule 23B of the Utah Rules of Appellate Procedure allows "[a] party to an appeal in a criminal case" to file a motion asking

this court to "remand the case to the trial court for entry of findings of fact, necessary for [this] court's determination of a claim of ineffective assistance of counsel." Utah R. App. P. 23B(a). A remand under this rule is "available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *Id.* We will "grant an appellant's motion for remand under rule 23B only upon satisfaction of the following requirements: (1) the motion must be supported by affidavits alleging facts outside the existing record, (2) the alleged facts must be non-speculative, and (3) the alleged facts, if true, must establish both elements of a traditional ineffective-assistance claim, i.e., counsel's deficient performance and resulting prejudice." *State v. Miller*, 2023 UT App 85, ¶ 52, 535 P.3d 390 (quotation simplified), *cert. denied*, 540 P.3d 78 (Utah 2023).

¶54 If the rule 23B motion "cannot meet the test for ineffective assistance of counsel, then there is no reason to remand the case." *State v. Samples*, 2022 UT App 125, ¶ 57, 521 P.3d 526 (quotation simplified), *cert. denied*, 525 P.3d 1279 (Utah 2023). It therefore follows that "a defendant must present the court with the evidence he intends to present on remand and explain how that evidence supports both prongs of the ineffective assistance of counsel test." *State v. Suhail*, 2023 UT App 15, ¶ 126, 525 P.3d 550 (quotation simplified), *cert. denied*, 531 P.3d 730 (Utah 2023). A defendant therefore "cannot meet his burden [under rule 23B] by merely pointing out what counsel did not do; he must bring forth the evidence that would have been available in the absence of counsel's deficient performance." *State v. Finlayson*, 2014 UT App 282, ¶ 24, 362 P.3d 926 (quotation simplified). "Furthermore, a defendant should identify witnesses who could testify at a rule 23B evidentiary hearing and must ordinarily submit affidavits from the witnesses detailing their testimony." *Id.* (quotation simplified). In this sense, rule 23B is not "an invitation to fish for facts." *State v. Gallegos*, 2020 UT 19, ¶ 40, 463 P.3d 641.

¶55 In her rule 23B motion, S.M. again claims that Counsel should have requested a continuance to investigate A.A.'s visit to the doctor, and she asks for a remand "for the specific purpose of developing a record to assist this court in determining if [Counsel] was ineffective." But S.M. does not support her motion with any affidavit from any witness "alleging facts outside the existing record." *Miller*, 2023 UT App 85, ¶ 52 (quotation simplified). Nor does she point to any other known facts that she believes could or would have been discovered by Counsel if Counsel had obtained a continuance and investigated further. In addition, S.M. also admits that it's possible that an investigation could "have led to facts that supported the State's case." In light of all this, we conclude that S.M. has failed to satisfy both her burden of production (i.e., of presenting this court with known facts that are currently outside the record) and her burden of persuasion (i.e., of showing that the proffered facts would satisfy both elements of an ineffective assistance claim). Because S.M. has not shown that a remand would allow her to "meet the test for ineffective assistance of counsel," we conclude that there "is no reason to remand the case." *Samples*, 2022 UT App 125, ¶ 57 (quotation simplified).[5]

---

5. As noted, S.M.'s rule 23B remand request and the related ineffective assistance claim from the direct appeal are both focused on possible evidence from A.A.'s doctor. And at the close of her rule 23B motion, S.M. asks us to order A.A. and Mother to sign releases permitting S.M. to question the doctor and his support staff, thereby allowing S.M. to now "fully investigate the limited scope of the medical appointment that took place on the date of the incident." Though somewhat unclear, S.M. seems to be suggesting that she thinks her efforts to potentially obtain any such evidence might be impaired by medical confidentiality rules.

But as explained above, the text of rule 23B and our cases establish that a remand is warranted only when the defendant
(continued…)

CONCLUSION

¶56 The claims of abuse from A.A. and C.A. were not inherently improbable, so we reject S.M.'s assertion that there was insufficient evidence to support the verdict. We likewise reject S.M.'s assertion that Counsel was ineffective for not requesting a continuance. The juvenile court's adjudication of S.M. is thus affirmed. Finally, we deny S.M.'s request for a rule 23B remand.

————————

---

proffers the existence of known evidence. S.M. has not directly asked us to create an exception to this limitation that would apply if a potential witness is unavailable due to a privilege or confidentiality rule, thereby impairing the defendant's ability to obtain the information necessary to support a rule 23B remand request. Nor, for that matter, has S.M. pointed to any legal authority that would allow us to modify the rule 23B requirements in this manner. And finally, she has not asserted that she has tried to obtain such information but was stymied by some assertion of privilege.

As a result, S.M. has given us no basis for concluding that her noncompliance with rule 23B's requirements should be excused. Because S.M. has not carried her burden under those requirements, we deny her request for a remand, and we also deny her request for an order requiring A.A. and Mother to sign medical releases.